UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

THE NEW YORK TIMES COMPANY,
SCOTT SHANE,

       Plaintiffs,

         vs.                            No. 15 Civ. 4829 (RA)

FEDERAL BUREAU OF
INVESTIGATION,

       Defendant.

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE FEDERAL
BUREAU OF INVESTIGATION'S MOTION FOR SUMMARY JUDGMENT AND IN
<u>OPPOSITION TO PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT</u>**

PREET BHARARA
United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007
Telephone: (212) 637-2699/2633
Fax: (212) 637-2686
caleb.hayes-deats@usdoj.gov
arastu.chaudhury@usdoj.gov

Of Counsel:

CALEB HAYES-DEATS
ARASTU K. CHAUDHURY
Assistant United States Attorneys

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ........................................................................................1

COUNTER-STATEMENT OF FACTS ...........................................................................2

      A.      Plaintiffs Had No Justifiable Expectation That the FBI Would
              Release the Requested 302s ...............................................................2

      B.      Plaintiffs Repeatedly Mischaracterize or Misconstrue the
              Relevant Events ................................................................................4

      C.      The FBI's Discretionary Release of Portions of the Requested
              302s Demonstrates Its Good Faith ....................................................6

ARGUMENT ..................................................................................................................7

I.       DISCLOSING THE REQUESTED 302s WOULD INTERFERE
        WITH PENDING OR PROSPECTIVE LAW ENFORECEMENT
        PROCEEDINGS BY REVEALING INFORMATION ABOUT
        ONGOING INVESTIGATIONS OF KNOWN AND SUSPECTED
        TERRORISTS...........................................................................................7

      A.      The "Logical and Plausible" Test Applies ....................................8

      B.      The Government Has Demonstrated That the Requested 302s
              Are the Kind of Investigative Record the Disclosure of Which
              Would Generally Interfere With Ongoing Law Enforcement
              Proceedings ......................................................................................9

      C.      The Investigations With Which Disclosure Would Interfere Are
               Ongoing, Satisfying Exemption 7(A)'s "Temporal" Requirement...........12

      D.      Exemption 7(A) Protects the Requested 302s in Their Entirety...............13

      E.      While the Government Does Not Oppose *In Camera* Review,
              Plaintiffs Have Not Justified Such Review ...................................14

II.      DISCLOSING THE REQUESTED 302s WOULD REVEAL
        INFORMATION THAT IS CLASSIFIED AND PROTECTED
        BY STATUTE, DISCLOSE THE PERSONAL INFORMATION
        OF FBI AGENTS, WITNESSES, AND THIRD PARTIES,
        AND EXPOSE THE FBI'S INVESTIGATIVE TECHNIQUES.........................15

      A.      The Government Has Demonstrated the Exemption 7(E)
              Applies .............................................................................................15

B.    Exemptions 6 & 7 (c) Protect Even Publicly Identified
Individuals from the Unwarranted Invasion of Their Privacy
That Disclosure Would Cause .................................................................16

C.    Exemptions 1 & 3 Protect All Classified Information in the
Requested 302s ........................................................................................17

III.   PRIOR DISCLOSURES HAVE NOT COMPROMISED THE FBI'S
ABILITY TO INVOKE THE FOIA EXEMPTIONS DISCUSSED
ABOVE.........................................................................................................18

IV.   THE FBI CANNOT REASONABLY SEGREGATE ADDITIONAL
MATERIAL FOR PRODUCTION ....................................................................22

CONCLUSION...........................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*ACLU v. Department of Defense,*
    389 F. Supp. 2d 547 (S.D.N.Y. 2005) ........................................................................ 14

*ACLU v. Department of Justice,*
    681 F.3d 61 (2d Cir. 2012) ............................................................................... 8, 15, 21

*Allard K. Lowenstein International Human Rights Project v. Department of Homeland Sec.,*
    626 F.3d 678 (2d Cir. 2010) ..................................................................................... 16

*Cook v. U.S. Department of Justice,*
    No. 04 Civ. 2542L, 2005 WL 2237615 (W.D. Wash. Sept. 14, 2005) ..................... 13

*Crooker v. Bureau of Alcohol, Tobacco & Firearms,*
    789 F.2d 64 (D.C. Cir. 1986) .................................................................................... 10

*Ctr. for National Sec. Studies v. U.S. Department of Justice,*
    331 F.3d 918 (D.C. Cir. 2003) .......................................................................... *passim*

*Dickerson v. Department of Justice,*
    992 F.2d 1426 (6th Cir. 1993) ....................................................................... 12, 23, 24

*Doherty v. U.S. Department of Justice,*
    775 F.2d 49 (2d Cir. 1985) ........................................................................................ 23

*Erb v. U.S. Department of Justice,*
    572 F. Supp. 954 (W.D. Mich. 1983) ....................................................................... 19

*Feiske v. Hirschmann,*
    No. 10 Civ. 8899 (RMB), 2012 WL 716632 (S.D.N.Y. Mar. 1, 2012) .................... 17

*Gerstein v. U.S. Department of Justice,*
    No. 03 Civ. 4893 (RMW), 2005 U.S. Dist. LEXIS 41276 (N.D. Cal. Sept. 30,
    2005) ......................................................................................................................... 11

*Halpern v. FBI,*
    181 F.3d 279 (2d Cir. 1999) ................................................................................ 14, 15

*Lead Industrial Association, Inc. v. OSHA,*
    610 F.2d 70 (2d Cir. 1979) ........................................................................................ 24

*Local 3, International Brotherhood of Electric Workers, AFL-CIO v. NLRB*,
    845 F.2d 1177 (2d Cir. 1988)............................................................................14

*Murphy v. FBI*,
    490 F. Supp. 1138 (D.D.C. 1980) ............................................................19, 20

*NLRB v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978)...................................................................10, 11, 13, 14

*N.Y. Times Co. v. Department of Justice*,
    756 F.3d 100 (2d Cir. 2014)....................................................................19, 20

*Solar Sources, Inc. v. United States*,
    142 F.3d 1033 (7th Cir. 1998) .........................................................................12

*Swan v. SEC*,
    96 F.3d 498 (D.C. Cir. 1996)..........................................................................10

*STS Energy Partners LP v. FERC*,
    82 F. Supp. 3d 323 (D.D.C. 2015) .................................................................12

*Tigue v. Department of Justice*,
    312 F.3d 70 (2d Cir. 2002)......................................................................23, 24

*United States v. Wilkerson*,
    361 F.3d 717 (2d Cir. 2004)...........................................................................20

*Wilson v. CIA*,
    586 F.3d 171 (2d Cir. 2009)...........................................................19, 20, 21, 22

**STATUTES**

5 U.S.C. § 552 .............................................................................................. *passim*

Defendant the Federal Bureau of Investigation (the "FBI" or the "Government"), by its attorney Preet Bharara, the United States Attorney for the Southern District of New York, respectfully submits this reply memorandum of law in further support of its motion for summary judgment and in opposition to the cross-motion of Plaintiffs the New York Times Company and Scott Shane (collectively, "Plaintiffs").

## PRELIMINARY STATEMENT

Plaintiffs fail to rebut the Government's demonstration that numerous provisions of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, exempt the FBI Form 302s ("302s") Plaintiffs have requested from disclosure. As the Government explained in its opening brief and in the supporting declaration of David M. Hardy, the requested 302s from interviews with Umar Farouk Abdulmutallab contain information about ongoing investigations of terrorist networks, the FBI's methods for gathering intelligence, the identities of investigators, targets, and unwitting third parties, and Abdulmutallab's strategies for evading counterterrorism defenses. *See* Memorandum of Law in Support of the Motion of the Federal Bureau of Investigation for Summary Judgment ("Gov. Br."); *see also* Declaration of David M. Hardy dated October 2, 2015 ("First Hardy Decl."). Accordingly, Exemptions 7(A), 1, 3, 6, 7(C), and 7(E) protect the requested 302s from disclosure. *See* 5 U.S.C. § 552(b)(1), (3), (6), (7)(A), (7)(C), & (7)(E).

Rather than meaningfully disputing the Government's legal analysis, Plaintiffs accuse the FBI of engaging in "a pattern of obstructionist behavior" and invite the Court to express "uneasiness" by ordering *in camera* review. *See* Plaintiffs' Memorandum of Law in Support of Their Cross-Motion for Summary Judgment and in Opposition to Defendant's Motion for Summary Judgment ("Pls. Br.") at 1, 19. While the Government has no objection to *in camera* review, the events catalogued by Plaintiffs do not reflect any obstruction by the FBI. Instead,

they reveal that Plaintiffs repeatedly misinterpreted their interactions with various Government officials, despite knowing since July 29, 2014—one day *before* Plaintiffs filed their FOIA request—that the FBI's Counter-Terrorism Division ("CTD") had determined not to release the requested 302s. *See* Decl. of Scott Shane dated November 6, 2015 ("Shane Decl.") Ex. A. In fact, as described below, the FBI's communications with Plaintiffs repeatedly emphasized that "[w]hat we provide will all hinge on CTD," Shane Decl. Ex. B, that release was not "approved as the information impacts pending cases," *id.* Ex. D, and that any suggestion to the contrary had not involved the "correct equity holders," *id.*, namely, the very division Plaintiffs knew *objected* to release. Thus, Plaintiffs' purported expectations of release were unjustified, as they knew or should have known that the requested 302s would be withheld. In any event, regardless of any expectation by Plaintiffs, the withheld documents and information are exempt from public disclosure on multiple grounds. Accordingly, the Court should grant summary judgment in favor of the FBI.

## COUNTER-STATEMENT OF FACTS

### A.    Plaintiffs Had No Justifiable Expectation That the FBI Would Release the Requested 302s

Much of Plaintiffs' argument relies on the extraordinary factual claim that "[m]ultiple Government officials in multiple offices repeatedly communicated to The Times that disclosure would not be a problem and that the materials requested were clearly in the public interest." Pls. Br. at 13. This claim is simply wrong. In each cited instance, Government officials either disclaimed the authority to make a disclosure, identified a need to confer with other, appropriate officials, or stated that the requested 302s would *not* be disclosed.

As a threshold matter, only the FBI's Records Management Division ("RMD") has the authority to disclose documents under FOIA. Second Declaration of David M. Hardy dated

2

November 23, 2015 ("Second Hardy Decl.") ¶ 5. Accordingly, Plaintiffs could not reasonably rely on statements by the United States Attorney's Office for the Eastern District of Michigan or the FBI's Office of Public Affairs ("OPA"). *Cf.* Shane Decl. ¶¶ 10–11. Nonetheless, even those statements fail to support Plaintiffs' claim.

Plaintiffs' declaration and its supporting exhibits contain the following information that belies the claim that "[m]ultiple Government officials" indicated "that disclosure would not be a problem." Pls. Br. at 13.

➤ "In February 2014, the U.S. Attorney's Office for the Eastern District of Michigan . . . told [Mr. Shane] that . . . because the 302s were FBI documents, they could be released only by that agency." Shane Decl. ¶ 10.

➤ "On July 29, 2014, the FBI Office of Public Affairs informed [Mr. Shane] that it could not release the 302s . . . ." Shane Decl. ¶ 12.

➤ "On July 29, . . . [an official from OPA] told [Mr. Shane] he had failed to persuade CT Division to turn [the requested 302s] over, and that [his] only option was to file a FOIA request." Shane Decl. Ex. A.

➤ On September 11, 2014, Mr. Hardy of RMD stated that what the FBI would provide in response to the FOIA request "will all hinge on CTD." Shane Decl. Ex. B.

➤ "On October 6, 2014, the FBI formally denied [Plaintiffs'] Request under FOIA Exemption 7(A)." Shane Decl. ¶ 19.

➤ "On December 16, 2014, . . . [the Office of Information Policy ("OIP")] directed the FBI to conduct a second review of [Plaintiffs'] Request." Shane Decl. ¶ 25.[1]

➤ On March 6, 2015, Mr. Hardy of RMD informed Mr. Shane that "release has not been approved as the information impacts pending cases." Shane Decl. Ex. D.

---

[1] As described below, this remand by OIP did not have the significance Plaintiffs now attribute to it. *See infra* at 5–6.

➢ On March 17, 2015, Mr. Hardy of RMD informed Mr. Shane that, after discussing Plaintiffs' request "with the subject matter experts, . . . I am in agreement we can't segregate any information at this point due to its impact on pending investigations." Shane Decl. Ex. D.

➢ On that same date, Mr. Hardy informed Mr. Shane that any "expectation of forthcoming information" resulted from the fact that the FBI's "initial internal coordination did not touch the correct equity holders." *Id.*

➢ "On March 20, 2015, the FBI formally denied [Plaintiffs'] Request for a second time." Shane Decl. ¶ 31.

➢ "By letter dated May 19, 2015, OIP affirmed the second denial." Shane Decl. ¶ 34.

Thus, Plaintiffs' own supporting materials disprove the claim that the Government indicated that it would disclose the requested 302s. Instead, Plaintiffs have known that CTD refused to release the requested 302s since July 29, 2014, and they have known that the response to their FOIA request would "hinge on CTD" since September 11, 2014. FBI's ultimate response to Plaintiffs' request was fully consistent with these early indications that the FBI would withhold the requested 302s.

**B.    Plaintiffs Repeatedly Mischaracterize or Misconstrue the Relevant Events**

Plaintiffs' factual recitation contains a number of other assertions that misunderstand or mischaracterize events relating to Abdulmutallab and Plaintiffs' FOIA request.

First, Plaintiffs repeatedly claim that the FBI did not designate material within the requested 302s as classified until after Plaintiffs filed their FOIA request. *See* Pls. Br. at 4; Shane Decl. ¶ 10. In an effort to bolster this theory, Plaintiffs note that prosecutors disclosed portions of the 302s to Dr. Simon Perry, an expert witness in Abdulmutallab's criminal case. *See* Pls. Br. at 4; Shane Decl. ¶ 9; *see also* First Hardy Decl. Ex. B at 3–4 (noting that Dr. Perry received redacted versions of the requested 302s subject to a non-disclosure agreement). Plaintiffs are

incorrect. Specifically, the requested 302s reveal that the FBI marked portions of the notes as classified at the time it initially transcribed the notes. Second Hardy Decl. ¶ 11.

Second, Plaintiffs mistakenly claim that the FBI "began throwing up a series of bizarre administrative hurdles" when it requested, for purposes of evaluating the applicability of Exemptions 6 & 7(C), that Plaintiffs show that Abdulmutallab was dead, that he consented to disclosure of the requested 302s, or that the public interest in disclosure outweighed Abdulmutallab's privacy interests. Pls. Br. at 5–6. But FBI issues an identical response to nearly all FOIA requests that seek records relating to third-party individuals. Second Hardy Decl. ¶¶ 6–8. In fact, the very letter of which Plaintiffs complain is a form letter. *Id.* ¶ 8; *see also* Shane Decl. ¶ 15; First Hardy Decl. Ex. D. FOIA itself dictates the FBI's approach. As discussed in the Government's opening brief, Exemptions 6 & 7(C) protect against "unwarranted" invasions of "personal privacy." Gov. Br. at 17–18. That Plaintiffs believed the public interest in disclosure clearly outweighed any privacy interest Abdulmutallab might have—a belief the FBI *shared*, Shane Decl., Ex. B—does not transform the invocation of a standard procedure into a "bizarre administrative hurdle[]."

Third, Plaintiffs wrongly claim that OIP "granted" the appeal from the initial denial of Plaintiffs' request, concluding that "Exemption 7(A) no longer appeared applicable." Pls. Br. at 7, 13. The language of the relevant administrative decision forecloses Plaintiffs' interpretation. OIP's Chief of the Administrative Appeals Staff remanded Plaintiffs' request for "further processing" to determine whether, after the completion of Abdulmutallab's appeal in his criminal case, Exemption 7(A) remained "applicable to withhold the records *in full.*" First Hardy Decl. ¶ 17 & Ex. I (emphasis added). The decision also acknowledged the possibility of a "future adverse determination . . . by the FBI." *Id.* Following remand, the Chief of the Administrative

5

Appeals Staff agreed that, notwithstanding the conclusion of Abdulmutallab's appeal, Exemption

7(A) still protected the requested 302s in full. *Id.* Ex. O. Specifically, he concluded that release

of the records at issue "could reasonably be expected to interfere with enforcement proceedings."

*Id.* Thus, Plaintiffs' attempt to suggest that OIP officials determined that "Exemption 7(A) no

longer appeared applicable" misreads the relevant documents. Pls. Br. at 13.

### C.   The FBI's Discretionary Release of Portions of the Requested 302s Demonstrates Its Good Faith

On October 27, 2015, the FBI discretionarily released heavily redacted excerpts from

forty-five pages of the requested 302s. Second Hardy Decl. ¶ 16. Plaintiffs argue that this

discretionary release was "strategic," Pls. Br. at 14 n.5, and that it contradicts Mr. Hardy's

statement that, "Segregability is not feasible as the records outlined above are exempt in full

under Exemption 7(A)," First Hardy Decl. ¶ 77; *see* Pls. Br. at 18. These arguments again

misunderstand the facts. The Government's opening brief argued, consistent with the First Hardy

Declaration and the cited case law, that Exemption 7(A) protects the requested 302s in their

entirety. *See* Gov. Br. at 13. Segregability refers to the isolation of non-exempt material within a

document so that the Government can produce the unprotected material without compromising

the interests that FOIA protects. *See* 5 U.S.C. § 552(b) (requiring production of "[a]ny

reasonably segregable portion of a record . . . *after deletion of portions which are exempt*"

(emphasis added)). Where an exemption protects the entirety of a document, no non-exempt

material exists within that document, and segregating exempt material from non-exempt material

is not possible, precisely as Mr. Hardy stated. First Hardy Decl. ¶ 77.

Nonetheless, mindful that the Government had previously disclosed limited information

regarding Abdulmutallab, *see* Gov. Br. at 3, the FBI exercised its discretion to isolate that

information for release, *see* Second Hardy Decl. ¶ 17. Such discretionary release is consistent

with guidance from the Attorney General, which "strongly encourage[s] agencies to make discretionary disclosures of information." Memorandum from the Office of the Attorney Gen. to the Heads of Exec. Dep'ts & Agencies (Mar. 19, 2009), *available at* http://www.justice.gov/ sites/default/files/ag/legacy/2009/06/24/foia-memo-march2009.pdf. Accordingly, the FBI's discretionary release reflects its good faith. In fact, as set forth below, the heavy redaction of the forty-five released pages underscores the difficulty of separating the publicly disclosed information from information that relates to ongoing law enforcement proceedings and falls within the scope of Exemptions 1, 3, 6, and 7(A), (C), & (E). Second Hardy Decl. ¶¶ 17, 25.

## ARGUMENT

As described below and in the Government's opening brief, the Court should grant summary judgment in favor of the FBI. Straightforward application of Exemptions 7(A), 1, 3, 6, 7(C), and 7(E) demonstrates that FOIA protects the withheld portions of the requested 302s. Contrary to the Plaintiffs' suggestion, public disclosures concerning Abdulmutallab have not forfeited the protections of Exemption 7(A) or any other exemption the Government has invoked. Finally, even if the cited exemptions did not protect the requested 302s in full, the FBI has established that no additional material can be reasonably segregated for production. Second Hardy Decl. ¶¶ 19–25.

**I.      DISCLOSING THE REQUESTED 302s WOULD INTERFERE WITH PENDING OR PROSPECTIVE LAW ENFORCMENT PROCEEDINGS BY REVEALING INFORMATION ABOUT ONGOING INVESTIGATIONS OF KNOWN AND SUSPECTED TERRORISTS**

In its opening brief, the Government explained that Exemption 7(A) protected the requested 302s in their entirety because those 302s are the kind of investigatory record whose disclosure would generally interfere with multiple, ongoing investigations of known and suspected terrorists. Gov. Br. at 7–13. Unable to dispute this analysis, Plaintiffs offer a series of

mistaken factual assertions that, under existing precedent, do not entitle them to the relief they

seek. Specifically, Plaintiffs argue that this case falls "outside the realm of national security

analysis," that the Hardy Declaration is too "broad and generic," and that the material cannot be

protected because Abdulmutallab's "terrorist plot publicly failed nearly *six* years ago." Pls. Br. at

14–17. Each argument fails.

### A.      The "Logical and Plausible" Test Applies

In an effort avoid the applicable test, under which courts must uphold the FBI's logical

and plausible invocations of Exemption 7(A), Plaintiffs argue that this case falls "outside the

realm of national security analysis." Pls. Br. at 17–18. This argument cannot withstand scrutiny.

Plaintiffs acknowledge, as they must, that the "general principle of deference to the executive on

national security issues" applies equally to invocations of Exemptions 1, 3, and 7(A). *Ctr. for

Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927–28 (D.C. Cir. 2003). Courts

exercise this deference by permitting an agency to withhold requested documents or information

whenever its "justification appears logical or plausible." *ACLU v. Dep't of Justice*, 681 F.3d 61,

69 (2d Cir. 2012) (internal quotation marks omitted). In the context of law enforcement

investigations that involve counter-terrorism matters, the need for such deference is readily

apparent:

> Exemption 7(A) explicitly requires a predictive judgment of the harm that will
> result from disclosure of information, permitting withholding when it "could
> reasonably be expected" that the harm will result. It is abundantly clear that the
> government's top counterterrorism officials are well-suited to make this
> predictive judgment. Conversely, the judiciary is in an extremely poor position to
> second-guess the executive's judgment in this area of national security.

*Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928 (citation omitted).

This rationale is plainly applicable here. Abdulmutallab went to Yemen to become involved in violent jihad, trained for two weeks at a camp operated by Al-Qaeda in the Arabian Peninsula ("AQAP"), received an explosive device from an AQAP bomb-maker, and attempted to detonate that explosive device while aboard a commercial flight bound for Detroit. First Hardy Decl. ¶ 5 & Ex. A at 12–14. The FBI's investigation into Abdulmutallab's conduct has generated "leads" that "connect[] to other ongoing and pending national security investigations." *Id.* ¶ 45. Because of these connections, disclosing the requested 302s could reasonably be expected to allow investigative targets to "counteract evidence developed by investigators, alter or destroy potential evidence[,] . . . create false and misleading evidence," or even "uncover the government's legal and investigative strategies." *Id.* Abdulmutallab's prior involvement in terrorism, and the connections between his acts and "other ongoing and pending national security investigations," easily refute Plaintiffs' unfounded claim that this case does not involve "national security analysis." Pls. Br. at 17. It is "abundantly clear" that the FBI's "top counterterrorism officials," with their specific knowledge of the ongoing investigations at issue, are best suited to make "a predictive judgment of the harm that will result from disclosure" of the requested 302s. *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928. Accordingly, the FBI has logically and plausibly established that Exemption 7(A) protects the withheld 302s.

**B.     The Government Has Demonstrated That the Requested 302s Are the Kind of Investigative Record the Disclosure of Which Would Generally Interfere With Ongoing Law Enforcement Proceedings**

Plaintiffs further argue that First Hardy Declaration is so "broad and generic" that its "statements will be true of every investigatory file." Pls. Br. at 14–15. Plaintiffs apparently fault the First Hardy Declaration for failing to provide additional information about the specific "ongoing and pending national security investigations" it references. First Hardy Decl. ¶ 45. For

example, Plaintiffs hypothesize that the Government could have disclosed whether Abdulmutallab had "actual involvement . . . in another plot" or whether the other suspects were "plotting an attack that happened to be similar to Abdulmutallab's." Pls. Br. at 13. Plaintiffs cite no precedent that would require such detail, and for good reason—this is precisely the type of information that Exemption 7(A) *protects*. As the D.C. Circuit has recognized, details that "could reveal much about the focus and scope of the [agency's] investigation . . . are . . . precisely the sort of information exemption 7(A) allows an agency to keep secret." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928 (quoting *Swan v. SEC*, 96 F.3d 498, 500 (D.C. Cir. 1996)). Plaintiffs invite the Court to transform Exemption 7(A) into a Catch-22, requiring agencies to compromise their investigations in an effort to protect them. The Court should decline this invitation.

Under the correct standard, the FBI need only demonstrate that disclosure of the "particular kinds of investigatory records" at issue will "generally interfere with enforcement proceedings." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 236 (1978) (internal quotation marks omitted). The FBI can make the required showing by identifying "a rational link between disclosure and the harms alleged." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 931; *see also Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 789 F.2d 64, 67 (D.C. Cir. 1986) (noting that an agency must "allow[] the court to trace a rational link between the nature of the document and the alleged likely interference"). The First Hardy Declaration easily satisfies this standard, identifying three distinct harms that disclosure could reasonably be expected to produce: (1) the targeting of "witnesses . . . for potential intimidation and/or physical harm"; (2) the possibility that targets could "counteract evidence developed by investigators"; and (3) potential divulgence of "the government's legal and investigative strategies." First Hardy Declaration ¶ 45. Courts have repeatedly applied Exemption 7(A) to the "particular kind of investigatory records" at issue

here, and they have done so in order to prevent exactly the types of harm that the First Hardy

Declaration foresees. *See Robbins Tire*, 437 U.S. at 236 (applying Exemption 7(A) to "witness

statements"); *id.* at 240–41 (applying Exemption 7(A) to address the "danger of witness

intimidation" and noting that "a suspected violator with advance access to [an agency's] case

could construct defenses which would permit violations to go unremedied" (internal quotation

marks omitted)); *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 929 ("On numerous occasions, both the

Supreme Court and this Court have found government declarations expressing the likelihood of

witness intimidation and evidence tampering sufficient to justify withholding of witnesses'

names under Exemption 7(A)." (citing *Robbins Tire*, 437 U.S. at 239–42)). Thus, under well-

established precedent, the First Hardy Declaration satisfies the applicable standard, and the Court

should uphold the FBI's invocation of Exemption 7(A).[2]

      Finally, contrary to Plaintiffs' conclusory assertion, the First Hardy Declaration is not so

"broad and generic" that its "statements will be true of every investigatory file." Pls. Br. at 14–

15. Not every investigative file will be "intertwined with other ongoing investigations of known

and suspected terrorists," First Hardy Decl. ¶ 43, much less divulge the Government's "sources

of information" and "legal and investigative strategies" in those ongoing investigations, *id.*

¶ 45(a) & (c). Instead, these statements specifically address the investigation into Abdulmutallab

---

[2] In an effort to escape the force of this precedent, Plaintiffs argue that courts have distinguished *Ctr. for Nat'l Sec. Studies* on the basis that it involved "a single, vital, ongoing enforcement proceeding." Pls. Br. at 15–16. The single case that Plaintiffs cite involved Exemption 7(E), and not Exemption 7(A). *Gerstein v. U.S. Dep't of Justice*, No. 03 Civ. 4893 (RMW), 2005 U.S. Dist. LEXIS 41276, at *38–*42 (N.D. Cal. Sept. 30, 2005). In that case, the Executive Office for United States Attorneys ("EOUSA") sought to withhold a survey EOUSA had conducted concerning the frequency with which different United States Attorney's Offices used "delayed-notice warrants." *Id.* at *39. Thus, *Gerstein* did not distinguish "a single, vital, ongoing enforcement proceeding" from other enforcement proceedings, as Plaintiffs suggest, but instead from an internal survey that contained only aggregated information. *Id.* at *39–*42. Plaintiffs do not explain how *Gerstein*'s analysis of Exemption 7(E) should guide this Court's application of Exemption 7(A), or why they regard the requested 302s as analogous to an internal survey. In any event, the First Hardy Declaration makes clear that this case can be considered a "single, vital, ongoing enforcement proceeding" with numerous components. *See* First Hardy Decl. ¶ 45 ("The investigation into Abdulmutallab's terrorist act does not stand in isolation; rather, the evidence and intelligence gathered and the resulting leads stretch like tentacles connecting to other ongoing and pending national security investigations.").

and the interference with other enforcement proceedings that the FBI reasonably expects would result from disclosure of the requested 302s. Thus, even putting aside Plaintiffs' misapprehension of the legal standard, Plaintiffs base their argument on factual assertions that are simply incorrect.

### C. The Investigations With Which Disclosure Would Interfere Are Ongoing, Satisfying Exemption 7(A)'s "Temporal" Requirement

Plaintiffs mistakenly argue that the Government has "overlook[ed]" jurisprudence regarding the "well-established proposition that Exemption 7(A) is temporal in nature." Pls. Br. at 16. The Government does not dispute that Exemption 7(A) applies only where enforcement proceedings are "pending or prospective." Gov. Br. at 8, 11. Nor does it dispute that Abdulmutallab's criminal prosecution is complete. *Id.* at 4. Nonetheless, the First Hardy Declaration's discussion of the "many other pending and related national security investigations" rebuts Plaintiffs' arguments concerning Exemption 7(A)'s temporal nature. First Hardy Decl. ¶ 45. As the Government explained in its opening brief, "so long as 'enforcement proceedings' continue against *someone,* it matters not that proceedings have ended against someone *else.*" *STS Energy Partners LP v. FERC*, 82 F. Supp. 3d 323, 332 (D.D.C. 2015); *see also Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1040 (7th Cir. 1998) ("The fact that the Government has closed a particular investigation does not make it any less likely that disclosure in this case 'could reasonably be expected to interfere with enforcement proceedings.'" (quoting Exemption 7(A))); Gov. Br. at 9–10. Plaintiffs do not address this case law.

Nor does it matter that nearly six years have passed since Abdulmutallab's terrorist plot failed. In fact, courts have applied Exemption 7(A) to ongoing investigations that have lasted significantly longer than six years. *See, e.g.*, *Dickerson v. Dep't of Justice*, 992 F.2d 1426, 1428, 1430 (6th Cir. 1993) (applying Exemption 7(A) to a FOIA request seeking files relating to the

FBI's ongoing investigation into the disappearance of Jimmy Hoffa in 1975); *Cook v. U.S. Dep't of Justice*, No. 04 Civ. 2542L, 2005 WL 2237615, at *2 (W.D. Wash. Sept. 14, 2005) (rejecting Plaintiff's position "that the investigation of the 1971 hijacking is dormant, making the law enforcement exemption inapplicable"). The First Hardy Declaration establishes a reasonable expectation that disclosure of the requested 302s will interfere with ongoing "enforcement proceedings." 5 U.S.C. § 552(b)(7)(A); First Hardy Decl. ¶¶ 43–45. Accordingly, Exemption 7(A) applies.[3]

### D.    Exemption 7(A) Protects the Requested 302s in Their Entirety

In its opening brief, the Government explained that, because Exemption 7(A) protects the particular kind of investigatory records at issue here, it covers the requested 302s in their entirety. Gov. Br. at 13. Plaintiffs do not address this argument, but simply assert that the FBI "must still disclose the segregable non-exempt parts." Pls. Br. at 18. Plaintiffs' argument again misses the point. As the Supreme Court explained in *Robbins Tire*, "although [FOIA's] segregability provision requires that nonexempt portions of documents be released, it does not speak to the prior question of what material is exempt." 437 U.S. at 224. Exemption 7(A) addresses that prior question, and rather than requiring a "specific evidentiary showing of the possibility of actual interference," it focuses the analysis on the "particular kinds of investigatory records" at issue. *Id.* at 218, 236. Because Exemption 7(A) protects the kind of investigatory record at issue here, it covers the requested 302s in their entirety, leaving no "non-exempt parts" for segregation and production. Nevertheless, the FBI, in its discretion, released redacted excerpts from forty-five pages of the requested 302s. Second Hardy Decl. ¶ 16. Thus, even if

---

[3] Plaintiffs further argue that the Government has neither "linked" any prosecutions to Abdulmutallab nor explained why he has "fresh, never-disclosed information still of use to investigators." Pls. Br. at 17. That is simply not the applicable legal standard. *See supra* Part I.B.

Exemption 7(A) did not protect the requested 302s in their entirety, the FBI has released all segregable portions. *Id.* ¶ 20.

E.     **While the Government Does Not Oppose *In Camera* Review, Plaintiffs Have Not Justified Such Review**

Relying on the mischaracterization of events discussed above, *see supra* at 2–6, Plaintiffs argue that the Court should express "uneasiness" by conducting *in camera* review. The Government has no objection to *in camera* review. But the Second Circuit's prior decisions establish that *in camera* review is "the exception, not the rule." *Local 3, Int'l Bhd. of Elec. Workers, AFL-CIO v. NLRB*, 845 F.2d 1177, 1180 (2d Cir. 1988), *cited with approval in Halpern v. FBI*, 181 F.3d 279, 295 (2d Cir. 1999). "[W]here the [agency] affidavit is sufficiently detailed to place the documents within the claimed exemptions, and where the government's assertions are not challenged by contrary evidence or a showing of agency bad faith," the Second Circuit has "held that the district court should restrain its discretion to order *in camera* review." *Halpern*, 181 F.3d at 292. As a result, "[c]ases generally disfavor *in camera* inspections by district court judges as the primary method for resolving FOIA disputes," *ACLU v. Dep't of Defense*, 389 F. Supp. 2d 547, 567 (S.D.N.Y. 2005), restricting it to those instances "when the issue before the District Court could not be otherwise resolved," *Robbins Tire*, 437 U.S. at 224.

Plaintiffs have not justified *in camera* review in this case. As described above, the First Hardy Declaration satisfies the applicable standard under Exemption 7(A), fully resolving the issues presented by Plaintiffs' FOIA request. *Robbins Tire*, 437 U.S. at 224; *see also Halpern*, 181 F.3d at 292. Even if any issues remained, courts have recognized a "number of options" other than *in camera* review for "eliciting further detail from the government." *Id.* at 295. Among other things, the Court can "require supplemental *Vaughn* affidavits" or, whenever "specificity . . . could compromise national security," "offer the government the option of

14

submitting additional *Vaughn* affidavits for *in camera* review." *Id.*[4] These approaches make particular sense where, as here, the executive's "predictive judgment of the harm that will result from disclosure of information" is at issue. *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928; *see also ACLU*, 681 F.3d at 70 ("[W]e have consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." (quoting *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927)).

## II.   DISCLOSING THE REQUESTED 302s WOULD REVEAL INFORMATION THAT IS CLASSIFIED AND PROTECTED BY STATUTE, DISCLOSE THE PERSONAL INFORMATION OF FBI AGENTS, WITNESSES, AND THIRD PARTIES, AND EXPOSE THE FBI'S INVESTIGATIVE TECHNIQUES

In its opening brief, the Government explained that, in addition to the protections provided by Exemption 7(A), Exemptions 1, 3, 6, and 7(C) & (E) protect large portions of the requested 302s, independently justifying the FBI's decision to withhold them. Gov. Br. at 14–23. Plaintiffs devote little discussion to these exemptions. Pls. Br. at 20–23. Nonetheless, the few challenges Plaintiffs do advance are misplaced.

### A.   The Government Has Demonstrated That Exemption 7(E) Applies

First, as the Government explained in its opening brief, Exemption 7(E) protects portions of the requested 302s that would "disclose techniques and procedures for law enforcement investigations." Gov. Br. at 20–23. Plaintiffs argue that, because the requested 302s transcribe what Abdulmutallab said, they cannot "reveal anything about law enforcement *techniques*." Pls. Br. at 21–22. As a purported example, Plaintiffs claim that Abdulmutallab's account of his explosive device cannot "reflect how law enforcement officers carry out their duties." *Id.* These arguments fail. The requested 302s reflect "notes of FBI interviews" with Abdulmutallab. First

---

[4] In a footnote, Plaintiffs argue that "[i]t is not clear what legal authority allows the Government to put in new and different proof." Pls. Br. at 22 n.7. As the discussion above indicates, *Halpern* provides ample legal authority for the submission of further declarations, including classified declarations. 181 F.3d at 295.

Hardy Decl. ¶ 11. Because what Abdulmutallab said during these interviews responded to questions posed by the FBI, disclosing the requested 302s will reveal, for example, "the broader investigative focuses . . . of the FBI's IT programs and the strategies it plans to pursue in preventing and disrupting terrorist activity." First Hardy Decl. ¶ 71. Such information falls squarely within Exemption 7(E). *See Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 682 (2d Cir. 2010) ("[F]ocusing on [particular] targets constitutes a 'technique or procedure.'").

The same analysis applies to Abdulmutallab's description of the explosive device used in his plot. Abdulmutallab "exploit[ed] travel security vulnerabilities" and succeeded in carrying his explosive device onto a commercial flight bound for Detroit. First Hardy Decl. ¶¶ 5, 76. As a result, the questioning reflected in the requested 302s reveals "the strategies and techniques the FBI and other law enforcement agencies use to fill knowledge gaps, and to detect and deter ongoing threats to the United States which emanate from the concealment of certain types of explosive devices." *Id.* ¶ 73. They also contain information concerning "the FBI's methods and strategies for . . . neutralizing these threats, and/or safeguarding against further criminal exploitation of these vulnerabilities." *Id.* In short, the requested 302s contain information about not only the "techniques employed *by Abdulmutallab* to build a bomb," Pls. Br. at 21, but also the techniques employed by the FBI to discover how that bomb circumvented existing methods of detection and whether different strategies might prove more effective in the future. Such information plainly falls within the scope of Exemption 7(E). *Lowenstein*, 626 F.3d at 682.

**B.     Exemptions 6 & 7(C) Protect Even Publicly Identified Individuals from the Unwarranted Invasion of Their Privacy That Disclosure Would Cause**

In its opening brief, the Government identified four categories of individuals for whom disclosure of the requested 302s would result in an unwarranted invasion of privacy: (1) FBI

16

personnel; (2) subjects of investigative interest; (3) third parties who are merely mentioned in the requested 302s; and (4) government personnel who do not work for the FBI. Gov. Br. at 17–20. Plaintiffs respond that two FBI agents who interrogated Abdulmutallab and the lawyers who prosecuted or defended him have already been publicly identified.[5] Pls. Br. at 22–23. As noted above, however, the requested 302s contain information about not only Abdulmutallab's crimes, but also other, ongoing conspiracies and investigative targets. *See supra* Part I. Accordingly, even though some of the relevant FBI agents and attorneys have been publicly associated with Abdulmutallab, divulging their identities in the requested 302s would further associate them with investigations of other potential targets, thereby resulting in an unwarranted invasion of their personal privacy. *See* First Hardy Decl. ¶ 63 (noting that investigative targets "may seek revenge on the agents and other federal employees involved in a particular case"). Accordingly, Exemption 7(C) protects even the identities of officials who have already been publicly linked to the investigation of Abdulmutallab's crime, and there is no legitimate public interest in disclosing the names of the Government personnel who questioned Abdulmutallab on particular dates.

### C.  Exemptions 1 & 3 Protect All Classified Information in the Requested 302s

Finally, the Government's opening brief explained at length why Exemptions 1 & 3 protect classified information within the requested 302s. Gov. Br. at 14–17. In response, Plaintiffs do not dispute that the First Hardy Declaration satisfies the standard for demonstrating classification, *see* First Hardy Decl. ¶¶ 47–59, but instead argue that "[n]o classification concerns were raised" initially in response to Plaintiffs' FOIA request or in the FBI's early email

---

[5] Because Plaintiffs have not responded to the Government's other invocations of Exemptions 6 & 7(C), they have conceded the propriety of those invocations. *See Feiske v. Hirschmann*, No. 10 Civ. 8899 (RMB), 2012 WL 716632, at *3 (S.D.N.Y. Mar. 1, 2012) ("A plaintiff effectively concedes a defendant's arguments by his failure to respond to them.").

correspondence with Plaintiffs. Pls. Br. at 23. Plaintiffs cite no authority for the proposition that

Exemptions 1 & 3 do not apply unless the agency asserts them in both its initial response and any

informal emails. In any event, the FBI can readily explain why it did not invoke Exemptions 1 &

3 in its initial response to Plaintiffs' FOIA request. As Plaintiffs noted in their appeal from that

response, Abdulmutallab's criminal case concluded on the same day that the FBI initially

responded to Plaintiffs' request. Shane Decl. Ex. C. Thus, at the time of the FBI's initial

response, Exemption 7(A) plainly covered all material in the FBI's investigative file, including

the requested 302s. Second Hardy Decl. ¶ 12. Only after Abdulmutallab's criminal case

concluded, and OIP remanded for further determination of whether Exemption 7(A) continued to

be "applicable to withhold the records in full," First Hardy Decl. Ex. I, did the FBI consider the

need to invoke other, supplemental protections, Second Hardy Decl. ¶ 13. Finally, to the extent

that informal correspondence between Plaintiffs and the FBI mistakenly created any "expectation

of forthcoming information"—although notably not the expectation of full production[6]—that

same correspondence explains that the FBI's "initial internal coordination did not touch the

correct equity holders." Shane Decl. Ex. D. Again, Plaintiffs have not grounded their argument

in any relevant authority, and the record rebuts their factual claims.

## III.    PRIOR DISCLOSURES HAVE NOT COMPROMISED THE FBI'S ABILITY TO INVOKE THE FOIA EXEMPTIONS DISCUSSED ABOVE

In its opening brief, the Government identified cases that explicitly address the impact of

official disclosures on agencies' invocations of Exemption 7(A). Gov. Br. at 23–25. These cases

---

[6] Plaintiffs argue that "Mr. Hardy . . . told Mr. Shane that materials would be released" without raising any concerns
about classification. Pls. Br. at 23. As a threshold matter, any supposed assurances that unspecified "materials"
would be provided did not indicate that the FBI would not withhold appropriate information as classified. Moreover,
review of the emails attached to Plaintiffs' declaration indicates only that the FBI was "working hard" to help
Plaintiffs meet a publication deadline, that it continued "to process the request . . . given its size and sensitive
equities," that a proposed release was "being reviewed by the subject matter experts," that the release was not
"approved as the information impacts pending cases," and that Mr. Hardy ultimately determined that the FBI could
not "segregate any information" from the requested 302s "due to its impact on pending investigations." Shane Decl.
Ex. D. None of these communications disclaimed the existence of classified information within the requested 302s.

identified considerations unique to Exemption 7(A) and concluded that limited official disclosures do not weaken the rationale for protecting investigative materials under FOIA. *See Murphy v. FBI*, 490 F. Supp. 1138, 1143 (D.D.C. 1980); *see also Erb v. U.S. Dep't of Justice*, 572 F. Supp. 954, 956 (W.D. Mich. 1983). Specifically, the courts found that the disclosures at issue fell "within the domain of prosecutorial discretion" and had not revealed the "breadth and exact nature of the government's evidence . . . to prospective defendants." *Murphy*, 490 F. Supp. at 1143. Plaintiffs have not addressed these cases.

Instead, Plaintiffs focus on cases that address the impact of official disclosures on Exemption 1, arguing that the Government can no longer invoke any FOIA exemption even though the limited official disclosures identified have described a small fraction of the information in the requested 302s. Pls. Br. at 23–26. Even assuming that this precedent governs in the Exemption 7(A) context, Plaintiffs' arguments fail. As set forth in the Government's initial brief, the official acknowledgment doctrine deprives the Government of the protections of Exemption 1 only where the withheld information is "as specific as the information previously released," "match[es] the information previously disclosed," and has been "made public through an official and documented disclosure." *Wilson v. CIA*, 586 F.3d 171, 186 (2d Cir. 2009); *see also N.Y. Times Co. v. Dep't of Justice*, 756 F.3d 100, 120 n.19 (2d Cir. 2014) (recognizing that *Wilson* "remains the law of this Circuit").

Plaintiffs attempt to avoid the "match" requirement by arguing that the new test is "whether disclosure of the withheld information would enhance any risk above and beyond what has already been disclosed." Pls. Br. at 24 (citing *N.Y. Times Co.*, 756 F.3d at 120–21).[7] The

---

[7] Plaintiffs claim that *N.Y. Times* has "now cast doubt on the reach of the *Wilson* test." Pls. Br. at 24. But under well-established Second Circuit precedent, each Second Circuit panel is "bound by the decisions of prior panels until such time as they are overruled either by an en banc panel of our Court or by the Supreme Court." *United States v.*

Second Circuit, however, did not apply the test that Plaintiffs now articulate. Rather, the panel in *N.Y. Times* applied the test from *Wilson*, including the match requirement. *See N.Y. Times*, 756 F.3d at 120. Indeed, that panel found a waiver only after it determined that the information sought was "as specific as the information previously released . . . [and] match[ed] the information previously disclosed." *Id.* (quoting *Wilson*, 586 F.3d at 186). While the Second Circuit did not interpret the matching element to require "absolute identity," *id.* at 120, it found that the previously disclosed information "virtually parallel[ed]" the information withheld, *id.* at 116; *see also id.* (finding a "substantial overlap" between the legal analysis in two documents). Thus, as *N.Y. Times* recognized, *Wilson* continues to apply in cases arising under Exemption 1, and the withheld information must still match, or "virtually parallel," the disclosed information in order to trigger the official acknowledgement doctrine.

The cases that address the impact of official disclosures on Exemption 7(A) identify particular considerations that favor a strict application of the matching requirement. Where official disclosures have not revealed the "breadth and exact nature of the government's evidence . . . to prospective defendants," *Murphy*, 490 F. Supp. at 1143, the release of any additional information on those topics directly implicates the concerns that animate Exemption 7(A), requiring a "predictive judgment of the harm that will result from disclosure," *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928. Thus, the determination of whether information matches or virtually parallels an official disclosure from the perspective of someone knowledgeable about the underlying facts will often mirror the judgment as to whether disclosure of that information can "reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A). As set forth above, courts decline to "second-guess the executive's judgment in

---

*Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).  Thus, *Wilson* bound the *N.Y. Times* panel, as the *N.Y. Times* panel itself acknowledged. *N.Y. Times Co.*, 756 F.3d at 120 n.19.

this area of national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928; *see also ACLU*, 681 F.3d at 70–71.

Plaintiffs identify a number of public disclosures that they contend are sufficient to satisfy the *Wilson* test. Pls. Br. at 25–26. But no substantial overlap or virtual parallel exists between the information contained in the disclosures Plaintiffs identify and the information in the requested 302s. Indeed, some of the disclosures the Plaintiffs identify do not involve the content from the requested 302s at all. For example, Plaintiffs cite documents created before all but one of the interviews at issue occurred: *Compare* White House, *White House Review Summary regarding the 12/25/2009 Attempted Terrorist Attack*, Jan. 7, 2010; Jesse Lee, White House Blog, *The Urgency of Getting This Right* (Jan. 5, 2010); and *Briefing by Homeland Security Secretary Napolitano, Assistant to the President for Counterterrorism and Homeland Security Brennan, and Press Secretary Gibbs*, Jan.7, 2010, *with* Shane Decl. Ex. A (requesting 302s from seventeen dates *after* January 28, 2010). These materials do not discuss information acquired during the interviews covered by Plaintiffs' FOIA request, but instead focus on what the government knew *before* the attempted terrorist attack occurred. Similarly, Plaintiffs identify a *Washington Post* article that contains details of the FBI's efforts in Lagos, Nigeria in the months after December 25, 2009. *See* Pls. Br. at 24 (citing Walter Pincus, *Obama Team Debated Treating Detroit Suspect Abdulmutallab as Enemy Combatant*, THE WASH. POST, Feb. 9, 2010)). But this article provides no information about what Abdulmutallab actually said to the FBI, or how the FBI's investigative work in Nigeria related, if at all, to those interviews. Thus, none of this information meaningfully overlaps with the requested 302s, let alone provides the virtual parallel that would forfeit protection under the official acknowledgment doctrine.

Neither do the other disclosures that Plaintiffs identify satisfy the *Wilson* test. *See* Pls. Br.

at 24–25 (citing Scott Lewis, *EXCLUSIVE: FBI Agents Reveal Underwear Bomber Wore Explosive Underwear for Three Weeks*, ABC 7 WXYZ Detroit (Sept. 28, 2012); Letter from Attorney General Eric Holder to Senator Mitch McConnell, dated February 3, 2010; President Barack Obama's Address at the National Defense University on May 23, 2013). Each disclosure contained some description of the December 25, 2009, bombing plot, but most such description remained high-level, without providing much detail. For example, the WXYZ local news program disclosed that Abdulmutallab wore the underwear bomb for about three weeks. *See* Scott Lewis, *EXCLUSIVE: FBI Agents Reveal Underwear Bomber Wore Explosive Underwear for Three Weeks*, ABC 7 WXYZ Detroit (Sept. 28, 2012); *id.* (noting that, during the first interview, Abdulmutallab "gave the FBI misinformation in an elaborate cover story"). While undisclosed portions of the requested 302s may contain equivalent information, as described below, that information cannot feasibly be segregated from the surrounding statements in the documents. Second Hardy Decl. ¶¶ 23–24. Moreover, none of the limited discussions Plaintiffs cite is "as specific as the information Plaintiffs now request." First Hardy Decl. ¶ 10; Second Hardy Decl. ¶ 18. Thus, the detail provided in the foregoing sources is not "as specific as" and/or does not "match[] the information" in the requested 302s. *New York Times*, 756 F.3d at 120 (quoting *Wilson*, 586 F.3d at 186) (internal quotation marks omitted). In short, there has been no official disclosure sufficient to forfeit any protection the FBI has invoked, and the Court should reject Plaintiffs' contrary suggestions.

## IV.   THE FBI CANNOT REASONABLY SEGREGATE ADDITIONAL MATERIAL FOR PRODUCTION

Finally, Plaintiffs argue that the Government should segregate additional, non-exempt material for production from the requested 302s. Pls. Br. at 18–19. In support of this argument, Plaintiffs claim that the portions of the requested 302s that the FBI has released "repeatedly

suggest that the redacted content deals solely with Abdulmutallab's own beliefs, motivations, planning, and similar details of no colorable use in other investigations." *Id.* at 12. The Court should reject Plaintiffs' argument.

Even assuming *arguendo* that Exemption 7(A) does not protect the requested 302s in their entirety, *but see supra* Part I.D; Gov. Br. at 13, the exemptions invoked by the FBI protect such a large portion of the requested 302s that no further information is "reasonably segregable." 5 U.S.C. § 552(b). The Second Circuit has declined to order segregation of "even . . . limited factual material admittedly in the public domain" where such information is "too intertwined with [protected] discussions to require disclosure." *Tigue v. Dep't of Justice*, 312 F.3d 70, 82 (2d Cir. 2002).[8] Similarly, the Sixth Circuit has observed that "the words 'reasonably segregable' must be given a reasonable interpretation, particularly where information or records compiled for law enforcement purposes are concerned." *Dickerson*, 992 F.2d at 1434.

These principles control here. As set forth in the Second Hardy Declaration, the exemptions discussed above and in the Government's opening brief protect the vast majority of the information contained in the requested 302s. Second Hardy Decl. ¶ 21. Any allegedly non-exempt material that remains is intertwined with protected information. *Id.* ¶ 22. Producing redacted copies of documents with additional information could reveal protected material to readers with knowledge of the underlying events by permitting inferences about withheld information based on its position relative to disclosed information. *Id.* ¶ 23. For example, where general summaries of detailed statements in the requested 302s have been disclosed, attempting to produce redacted versions of the requested 302s that reflect matching information will likely

---

[8] The Second Circuit has also observed that the predominance of protected material provides a basis for denying *in camera* review on the issue of segregability. *See Doherty v. U.S. Dep't of Justice*, 775 F.2d 49, 53 (2d Cir. 1985) ("The fact that there may be some nonexempt matter in documents which are predominantly exempt does not require the district court to undertake the burdensome task of analyzing approximately 300 pages of documents, line-by-line.").

reveal additional, protected details, either because such details would be necessary to render the produced information intelligible, or because knowledgeable readers could use the produced information to fill in the gaps. *Id.* ¶ 24. Given the difficulties of disclosing any additional information in the requested 302s, the Court should conclude that no further information is "reasonably segregable." *Lead Indus. Ass'n, Inc. v. OSHA*, 610 F.2d 70, 86 (2d Cir. 1979).

Contrary to Plaintiffs' assertions, far from undermining the Government's arguments relating to segregability, the information the FBI has released from the requested 302s supports those arguments. Plaintiffs cannot draw inferences about the information the FBI has redacted from the forty-five pages it produced based on the unredacted portions of those pages. The FBI released the unredacted information precisely because it did not provide details concerning cases other than Abdulmutallab's, and it redacted the withheld information because it did provide such details, or other information that falls within the scope of the FOIA exemptions the FBI has invoked. Second Hardy Decl. ¶¶ 17, 25; Shane Decl. Ex. F. Furthermore, the produced pages reinforce the difficulty of segregating allegedly non-exempt information for production. Second Hardy Decl. ¶ 25. The FOIA exemptions the FBI has invoked protect the vast majority of the information on the forty-five produced pages, and the material that can be isolated for release often consists of little more than isolated words and phrases. *Id.*; Shane Decl. Ex. F. These pages demonstrate the "intertwined" nature of the protected and allegedly unprotected material, *Tigue*, 312 F.3d at 82, and underscore that attempting to isolate material for production from the remaining pages of the requested 302s would not be "reasonable," *Dickerson*, 992 F.2d at 1434.[9] Accordingly, the Court should reject Plaintiffs' argument and decline to order the Government to conduct an additional segregability review.

---

[9] Moreover, as in *Dickerson*, such production would prove "useless to plaintiff . . . and his newspaper." 992 F.2d at 1434.

## CONCLUSION

For all of the reasons stated herein and in the Government's opening brief, the

Government respectfully requests that the Court grant summary judgment in favor of the FBI,

deny Plaintiffs' cross-motion for summary judgment, and dismiss Plaintiffs' complaint in its

entirety.

Dated:          November 23, 2015                              Respectfully submitted,
                New York, New York

                                                              PREET BHARARA
                                                              United States Attorney for the
                                                              Southern District of New York

                                          By:     */s/ Caleb Hayes-Deats*
                                                  CALEB HAYES-DEATS
                                                  ARASTU K. CHAUDHURY
                                                  Assistant United States Attorneys
                                                  86 Chambers Street, Third Floor
                                                  New York, New York 10007
                                                  Telephone: (212) 637-2699/2633
                                                  Fax: (212) 637-2686
                                                  caleb.hayes-deats@usdoj.gov
                                                  arastu.chaudhury@usdoj.gov