UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 11/7/17.
```

---

THE NEW YORK TIMES COMPANY AND
SCOTT SHANE,

                              Plaintiffs,

              v.

FEDERAL BUREAU OF INVESTIGATION,

                              Defendant.

---

No. 15-CV-4829 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

The New York Times and Scott Shane (collectively, the "Times") brought this action under the Freedom of Information Act ("FOIA") seeking access to the Federal Bureau of Investigation's summaries of its interviews with Umar Farouk Abdulmutallab in the days and months after he attempted to detonate an explosive device on a commercial airliner headed to Detroit. The FBI initially refused to provide the Times any of its interview notes, or Form 302s ("302s"), which memorialize its debriefings with Abdulmutallab, but made a limited disclosure after this lawsuit was filed. The Times continued to seek additional material, relying in part on the fact that public documents, including some that were filed in connection with Abdulmuttalab's criminal sentencing, had been derived from the 302s. After the Court conducted an *in camera* review of the 302s, ordered the FBI to conduct segregability analyses, and required it to provide a line-by-line justification for withholding any remaining material, the FBI released 188 of the 195 pages of the 302s with substantially fewer redactions.

Left for the Court to decide is whether the material that remains redacted has been properly withheld under FOIA. After careful *in camera* review, the Court is persuaded that the redacted material remaining is exempt from disclosure pursuant to FOIA Exemptions 1, 7(A), and 7(C),

and that all reasonably segregable information has now been disclosed, with one possible exception. Accordingly, the Court grants the FBI's motion for summary judgment.

## BACKGROUND

### A. Abdulmutallab's Arrest, Conviction, and Sentencing

On December 25, 2009, Umar Farouk Abdulmutallab,[1] a Nigerian national now known as the "Underwear Bomber," attempted to detonate an explosive device concealed in his underwear while aboard a commercial flight from Amsterdam to Detroit. *See* Decl. of David M. Hardy ("First Hardy Decl.") ¶ 5 (Dkt. 19). The bomb started a fire but did not explode. *See id.* Abdulmutallab was apprehended and taken into custody. *See id.*

Between December 25, 2009 and April 30, 2010, the FBI interviewed Abdulmutallab at least eighteen times. *See id.* Ex. B at 3–4. During these interviews, Abdulmutallab stated that he had traveled to Yemen in 2009, where he met Anwar al-Awlaki and became involved in violent jihad. *See id.* Ex. A at 12. Abdulmutallab explained that he spent three days at Awlaki's home and was selected for a martyrdom mission. *See id.* Abdulmutallab then met Ibrahim Al Asiri, a bomb-maker for Al Queda in the Arabian Peninsula ("AQAP"), who constructed a bomb for Abdulmutallab and showed him how to use it. *See id.* at 13–14. Abdulmutallab further stated that he had trained for two weeks at a camp operated by AQAP. *See id.* at 13. The FBI memorialized these interviews in Form 302s.

On January 6, 2010, Abdulmutallab was indicted in the United States District Court for the Eastern District of Michigan. *See id.* ¶ 6. On October 12, 2011, Abdulmutallab pled guilty to eight charges, including the attempted use of a weapon of mass destruction and conspiracy to

---

[1] Some records refer to Abdulmutallab as "UFAM," "UM," or "Abdulmatallab."

commit an act of terrorism.  *See id.* ¶ 7.  On February 16, 2012, he was sentenced to four consecutive terms of life imprisonment and a fifth consecutive term of thirty years.  *See id.*

In advance of Abdulmutallab's sentencing, the government filed a sentencing memorandum.  Attached to that memorandum was a three-page appendix, which was "intended to provide the Court with details about Defendant Abdulmutallab's interactions with [AQAP] terrorists in the months leading up to his attack."  *Id.* Ex. A at 12.  The appendix described, among other things, Abdulmutallab's travels to Yemen, his interactions with Awlaki, Al Asiri, and other AQAP members, and the martyrdom mission he intended to execute.  *See id.* at 12–14.  The appendix stated that "the bulk of material provided comes from debriefing statements [Abdulmutallab] made to FBI agents from January to April 2010."  *Id.* at 12.

Also in connection with Abdulmutallab's sentencing, the government filed a 22-page report by Dr. Simon Perry, a professor of criminology at Hebrew University, which "assess[ed] [Abdulmutallab's] future dangerousness or likelihood of again attempting a martyrdom mission if released from prison."  *Id.* Ex. B at 2–3.  To allow Dr. Perry to conduct this assessment, the government provided Dr. Perry redacted versions of the 302s at issue here, subject to a non-disclosure agreement.  *See id.* at 3.  Dr. Perry's report, which was publicly available, cited the 302s over forty times.  *See id.*

## B.  The FOIA Request and the FBI's Response

On July 30, 2014, Scott Shane sent the FBI an e-mail requesting, under FOIA, "[a]ll Form 302s with notes of FBI interviews with Umar Farouk Abdulmutallab" on the eighteen dates referenced in Dr. Perry's report.  *See id.* ¶ 11, Ex. C.[2]

_____

[2] The FBI initially responded to Shane's request with a letter dated August 13, 2014, which stated that "[d]isclosure of most of the records you requested could constitute an invasion of the privacy of third

On October 13, 2014, the FBI denied Shane's request. *See id.* ¶ 14, Ex. F.  Citing FOIA Exemption 7(A), which applies to certain "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7), the FBI stated that the records Shane requested were "law enforcement records" that are not subject to disclosure, *see* First Hardy Decl. Ex. F.  The FBI further stated that there was a "pending or prospective law enforcement proceeding" relevant to the records, and that "release of the information in these responsive records could reasonably be expected to interfere with enforcement proceedings." *Id.*  On October 14, 2014, the Times appealed the FBI's denial of his FOIA request to the Department of Justice's Office of Information Policy. *See id.* Ex. G.

On December 16, 2014, the Office of Information Policy remanded Shane's request to the FBI for further processing of responsive records. *See id.* Ex. I.  The letter remanding Shane's request stated that, "[a]lthough the FBI invoked Exemption 7(A) . . . at the time your initial request was processed, that exemption may no longer be applicable to withhold the record in full." *Id.*

On remand, the FBI again denied Shane's request. *See id.* ¶ 20, Ex. L.  In a letter dated March 20, 2015, the FBI stated that the requested records were entirely exempt under Exemption 7(A), as well as Exemptions 1, 3, 6, 7(C), and 7(E). *See id.*  On March 24, 2015, Shane appealed this decision. *See id.* ¶ 21, Ex. M.

On May 19, 2015, the Office of Information Policy affirmed, "on partly modified grounds," the FBI's denial of Shane's request. *See id.* ¶ 23, Ex. O.  In a letter to Shane, the Office of Information Policy stated that the FBI "properly withheld this information in full because it is protected from disclosure" under Exemption 7(A). *Id.* Ex. O.  In a footnote, the letter stated that

---

party individuals" and denying access to the records under Exemptions 6 and/or 7(C).  *See* First Hardy Decl. ¶ 12, Ex. D.

the Office affirmed only the FBI's invocation of Exemption 7(A) and did not waive the government's right "to claim other exemptions that may be applicable to these records." *Id.*

### C. The Instant Litigation

On June 22, 2015, the Times filed a complaint in this action. *See* Compl. (Dkt. 1). Relying on the administrative record, both parties moved for summary judgment. *See* Def.'s Mot. for Summ. J. (Dkt. 17); Pl.'s Mot. for Summ. J. & Opp'n to Def.'s Mot. for Summ. J. (Dkt. 23). The FBI argued that the requested 302s were entirely exempt under Exemption 7(A), asserting that these records "contain information about ongoing investigations of terrorist networks, reveal the FBI's methods for gathering intelligence, identify investigators, targets, and unwitting third parties, and analyze Abdulmutallab's strategies for evading counterterrorism defenses." Def.'s Mem. in Supp. of FBI's Mot. for Summ. J. ("FBI Mem.") at 1 (Dkt. 18).[3] The FBI further argued that portions of the requested 302s were also exempt from disclosure pursuant to Exemptions 1, 3, 6, 7(C), and 7(E). *See id.* at 1–2.

The FBI acknowledged, however, that at least some information regarding Abdulmutallab's interviews with the FBI had already been disclosed to the public. See *id.* at 23 & n.9. In particular, the FBI noted that there were "relatively modest and general disclosures of information concerning Abdulmutallab in the Government's sentencing submission," and that both President Obama and Attorney General Eric Holder had made public statements regarding Abdulmutallab's association with terrorists and the AQAP network—including the fact that he had stayed at Awlaki's home for three days, trained at an AQAP camp for two weeks, and attempted

---

[3] The FBI supported its motion with a declaration by David M. Hardy, who was the Section Chief of the Record/Information Dissemination Section, Records Management Division at the FBI. *See* First Hardy Decl.

to execute a suicide mission planned by Awlaki. *See id.* at 23 & n.9. The FBI argued, however, that these disclosures simply did not provide information "as specific as" the information contained in the requested 302s. *Id.* at 24. In particular, the FBI claimed that, unlike the information disclosed by officials and in the sentencing memorandum, the requested 302s provided "detailed information" related to "ongoing investigations of terrorist networks," the FBI's "investigative techniques," "intelligence activities, sources, and methods," and the identities of "unwitting third parties." *Id.* The FBI took the position that, because the documents at issue were protected by Exemption 7(A) in their entirety, it was not required to analyze whether any portions of the requested 302s were segregable under FOIA. *See id.* at 13.

On October 27, 2015, a few weeks after the FBI had filed its opening brief, the FBI produced, in heavily redacted form, 45 pages of the requested 302s. *See* Decl. of Scott Shane ("Shane Decl.") ¶ 36, Ex. F (Dkt. 25); *see also* Second Decl. of David M. Hardy ("Second Hardy Decl.") ¶ 16 (Dkt. 27). In its reply brief and in Hardy's second declaration, the FBI explained that it had "attempted to isolate the material from the 302s that matched the previously disclosed information" from Dr. Perry's report and the sentencing memorandum. Second Hardy Decl. ¶ 17. In his second declaration, Hardy stated that, "[a]fter extensive review of the documents at issue, including a page-by-page review in comparison to what is already in the public domain, [he had] determined that there is no further non-exempt information that can be reasonably segregated and released without revealing exempt information." *Id.* ¶ 26. Despite its voluntary disclosure of redacted versions of some of the requested 302s, the FBI again asserted that, as a matter of law, it was not obligated to conduct any segregability analysis for documents withheld pursuant to

Exemption 7(A). *See* Def.'s Reply Mem. in Further Supp. of FBI's Mot. for Summ J. & in Opp'n to Pls.' Cross-Mot. for Summ. J. ("FBI Reply Mem.") at 6 (Dkt. 26).

The Times argued, among other things, that the FBI had failed to satisfy its burden of showing that the remaining 302s fell within Exemption 7(A). *See* Pls.' Mem. in Supp. of Cross-Mot. for Summ. J. & in Opp'n to Def.'s Mot. for Summ J. ("Times Mem.") at 11–18 (Dkt. 24). The Times requested that the Court conduct an *in camera* review of the withheld 302s. *See id.* at 18–19. The FBI informed the Court that it "ha[d] no objection to *in camera* review." FBI Reply Mem. at 1.

### D. September 29, 2016 Ruling

On September 29, 2016, the Court denied the parties' cross-motions for summary judgment without prejudice in an oral ruling. *See* Order (Dkt. 33); Tr. of Sept. 29, 2016 Conf. (Dkt. 35). The Court concluded that, on the basis of the First and Second Hardy Declarations, the FBI had carried its burden of demonstrating that the withheld 302s were exempt from disclosure under Exemption 7(A), as the release of these records could "reasonably be expected to interfere with ongoing and pending national security investigations." Tr. of Sept. 29, 2016 Conf. at 6:14–19, 7:13–18. The Court explained that the Hardy Declarations detailed three ways in which the disclosure of these documents could interfere with national security investigations: (1) by allowing for the identification of witnesses, which would risk their intimidation or harm, (2) by allowing third parties to counteract, alter, or destroy the government's evidence, and (3) by disclosing the government's legal and investigative strategies. *See id.* at 7:6–12.

Nonetheless, in light of questions raised regarding segregability and waiver, the Court concluded that *in camera* review was appropriate. *See id.* at 8:6–8. In reaching that conclusion,

the Court rejected the FBI's argument that it was not required to conduct any segregability analysis for records withheld under Exemption 7(A), reasoning that a plain reading of the statute demonstrates that the segregability requirement applies to all FOIA exemptions. *See id.* at 8:15–25.[4]  The Court also noted that, under the circumstances of this case, the FBI's claim that segregation was not feasible was questionable, where the FBI had subsequently released portions of the requested 302s. *See id.* at 9:1–3.  Given the Court's doubts regarding the FBI's position regarding segregability, as well as the outstanding question of whether the government had waived any FOIA exemptions, the Court determined that an *in camera* review was appropriate. *See id.* at 9:4–13.[5]

### E. *In Camera* Review, December 21, 2016 *Ex Parte* Conference, and Supplemental Submissions

On October 14, 2016, the FBI delivered the withheld 302s, along with an *ex parte* declaration of Carl Ghattas, Assistant Director for Counterterrorism at the FBI, to the Court for *in camera* review. *See* Dkt. No. 39.  After reviewing the documents *in camera*, on December 21, 2016, the Court held an *ex parte* conference with the FBI.[6]  During this conference, the Court

---

[4] *See also Juarez v. Dep't of Justice*, 518 F.3d 54, 60 (D.C. Cir. 2008) (explaining in a case where Exemption 7(A) was invoked, that a "district court both has an affirmative duty to consider the segregability issue *sua sponte* and that it errs when it approves the government's withholding of information under the FOIA without making an express finding on segregability." (internal quotation marks omitted)); *Schiller v. NLRB*, 964 F.2d 1205, 1209 (D.C. Cir. 1992) ("The 'segregability' requirement applies to all . . . documents and all exemptions in the FOIA." (quoting *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984)), *abrogated on other ground by Milner v. Dep't of Navy*, 562 U.S. 562 (2011))).

[5] *See also Rugiero v. U.S. Dep't of Justice*, 234 F. Supp. 2d 697, 707 (E.D. Mich. 2002) (finding *in camera* review appropriate where "nineteen [released and redacted] illustrative pages cast serious doubt on the Government's argument that the nonexempt information in the withheld documents is so inextricably intertwined with exempt information that only meaningless words and phrases would be disclosed by the redacted pages"); *Dow Jones & Co. v. U.S. Dep't of Justice*, 880 F. Supp. 145, 151 (S.D.N.Y. 1995) (Sotomayor, J.) ("[C]ourts are more likely to conduct *in camera* review in those cases where the plaintiff asserts that an otherwise applicable FOIA exemption has been waived."), *vacated in part sub nom.*, 907 F. Supp. 79 (S.D.N.Y. 1995).

[6] A transcript of the December 21, 2016 *ex parte* conference has been produced and filed under

"identified certain information in the 302s that, in the Court's view, (1) was identical to information that had previously been officially disclosed by the Department of Justice, (2) substantially overlapped with information that had been officially disclosed, or (3) did not fall within the specific categories of protected information that were addressed in the declarations the FBI had submitted." Def.'s Letter to Ct. at 1–2 (Feb. 21, 2017) (Dkt. 43) ("Feb. 21, 2017 Letter"). At the conclusion of the conference, the Court directed the FBI to conduct a segregability analysis and an additional review of the records withheld consistent with the guidance provided by the Court during the conference. The Court ordered that the FBI produce all segregable non-exempt information as soon as possible, on a rolling basis, and in any event no later than February 21, 2017. The Court instructed the FBI that, at a subsequent conference, it must provide a line-by-line justification for withholding any information in the 302s. *See* Order (Dkt. 41).

On February 21, 2017, the FBI informed the Court that it had "conducted the further segregability analysis ordered by the Court" and had "released substantial additional information from the 302s." Feb. 21, 2017 Letter at 2. Specifically, the FBI had produced 188 of the 195 pages of redacted 302s.[7] The FBI explained that it "does not contend that Exemption 7(A) protects" all information in the withheld 302s but that "the overwhelming majority of the information contained in the 302s . . . does not meet the criteria for official disclosure . . . and accordingly remains protected by Exemption 7(A)." *Id.* at 2. Nonetheless, "as a matter of discretion," the FBI had "released additional information that has not been officially disclosed,

seal.

---

[7] The following day, the Times published the newly released 302s on its website. *See* Scott Shane, *Inside Al Qaeda's Plot to Blow Up an American Airliner*, N.Y. Times, https://www.nytimes.com/2017/02/22/us/politics/anwar-awlaki-underwear-bomber-abdulmutallab.html (Feb. 22, 2017).

and thus, in the FBI's view, would have remained protected." *Id.*[8]

### F.   February 27, 2017 *Ex Parte* Conference and Supplemental Submissions

On February 27, 2017, the Court held a second *ex parte* conference.[9]   At the conclusion of this conference, the Court ordered the FBI to conduct yet another segregability analysis and to again produce any segregable, non-exempt information "as soon as possible, on a rolling basis." *See* Order (Dkt. 45).

On May 26, 2017, pursuant to the Court's order, the FBI made a supplemental submission, in which it explained that it had "performed a further segregability review of the Form 302s" and "made limited additional disclosures to [P]laintiffs." Def.'s Letter to Ct. at 1 (May 26, 2017) (Dkt. 47).   In connection with this submission, the FBI submitted a declaration by Michael F. McPherson, Section Chief for the International Counterterrorism Operations Section I at the FBI. *See In Camera, Ex Parte* Decl. of Michael J. McPherson in Supp. of Def.'s Mot. for Summ. J. ("McPherson Decl.") (Dkt. 48).   McPherson's declaration addressed specific questions the Court had posed at the February 27, 2017 *ex parte* conference.   In particular, McPherson discussed, among other things: (1) individuals discussed by Abdulmutallab, *see id.* ¶ 6; (2) the names of other individuals identified in the 302s, *see id.* ¶ 7; and (3) the names of individuals depicted in photographs shown to Abdulmutallab, *see id.* ¶ 9.   Relying on McPherson's declaration, as well as

---

[8] The FBI also argued that it should not be required to conduct a line-by-line analysis segregability analysis, as the Court had previously ordered.   *See* Feb. 21, 2017 Letter at 2–4.   The Court rejected this argument, explaining that the decision of whether to conduct a line-by-analysis is one left to the discretion of the district court and that, under the circumstances of this case, such an analysis would be both helpful and efficient in determining whether the FBI had properly withheld information under FOIA.

[9] A transcript of the February 27, 2017 *ex parte* conference has also been produced and filed under seal.

the declarations it had previously submitted, the FBI argued that the Court should uphold the remaining withholdings under Exemptions 6, 7(A), 7(C), and 7(E).

## LEGAL STANDARD

FOIA requires federal agencies to make records available to the public upon request. *See* 5 U.S.C. § 552(a). "Congress enacted FOIA 'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny.'" *Cook v. Nat'l Archives & Records Admin.*, 758 F.3d 168, 173 (2d Cir. 2014) (quoting *U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991)); *see also Grand Cent. P'Ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) ("FOIA was enacted to promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." (internal quotation marks omitted))). FOIA reflects "a general philosophy of full agency disclosure," *Dep't of Air Force v. Rose*, 425 U.S. 352, 360 (1976) (citation omitted), and "adopts as its most basic premise a policy strongly favoring public disclosure of information in the possession of federal agencies," *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999). "It 'requires the government to disclose its records unless its documents fall within one of the specific, enumerated exemptions set forth in the Act.'" *Brennan Ctr. for Justice at N.Y. Univ. Sch. of Law v. U.S. Dep't of Justice*, 697 F.3d 184, 194 (2d Cir. 2012) (quoting *Nat'l Council of La Raza v. Dep't of Justice*, 411 F.3d 350, 355–56 (2d Cir. 2005)). "Because FOIA manifests a 'strong presumption in favor of disclosure,' [courts] construe FOIA exemptions narrowly, resolving doubts in favor of disclosure and imposing on the government the burden of showing that an asserted exemption indeed applies." *Cook*, 758 F.3d at 173 (quoting *Ray*, 502 U.S. at 173).

FOIA also contains a so-called "segregability provision," which provides that "[a]ny

11

reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt." 5 U.S.C. § 552(b). "[T]he segregability provision requires that nonexempt portions of documents be released" even when documents are withheld pursuant to an exemption. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 224 (1978). "The focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material." *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). In considering segregability, however, the Court must be "sensitive . . . to the relation of the factual segments to the [record] as a whole." *Lead Indus. Ass'n, Inc. v. Occupational Safety & Health Admin.*, 610 F.2d 70, 85 (2d Cir. 1979). "This rule of segregation applies to all FOIA exemptions." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

In a case involving international terrorism, like this one, courts must proceed with a keen awareness of the deference afforded to the executive branch in evaluating risks to national security. *See Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 76 (2d Cir. 2009). "Recognizing the relative competencies of the executive and judiciary," as the Second Circuit has explained, "it is bad law and bad policy to 'second-guess the predictive judgments made by the government's intelligence agencies,' regarding questions such as whether disclosure of terrorist-related surveillance records would pose a threat to national security." *Id.* (quoting *Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009)); *see also Dep't of Navy v. Egan*, 484 U.S. 518, 530 (1988) ("[C]ourts traditionally have been reluctant to intrude upon the authority of the executive in military and national security affairs."); *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 927 (D.C. Cir. 2003) (explaining that "deference in national security matters" is appropriate under all FOIA exemptions

12

"so long as the government's declarations raise legitimate concerns that disclosure would impair national security" because "judicial deference depends on the substance of the danger posed by disclosure—that is, harm to the national security—not the FOIA exemption invoked"). "Even if the redacted information seems innocuous in the context of what is already known by the public, '[m]inor details of intelligence information may reveal more information than their apparent insignificance suggests because, much like a piece of jigsaw puzzle, each detail may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself.'" *ACLU v. U.S. Dep't of Justice*, 681 F.3d 61, 71 (2d Cir. 2012) (quoting *Wilner*, 592 F.3d at 73).

"FOIA cases are typically resolved on summary judgment." *New York Times Co. v. United States Dep't of Justice*, 235 F. Supp. 3d 522, 529 (S.D.N.Y. 2017). "In order to prevail on a motion for summary judgment in a FOIA case, the defending agency has the burden of showing that its search was adequate and that any withheld documents fall within an exemption to the FOIA." *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 812 (2d Cir. 1994).[10] "An agency that has withheld responsive documents pursuant to a FOIA exemption can carry its burden to prove the applicability of the claimed exemption by affidavit[.]" *Wilner*, 592 F.3d at 73. Affidavits submitted by an agency "are accorded a presumption of good faith." *Florez v. CIA*, 829 F.3d 178, 182 (2d Cir. 2016) (quoting *Ctr. for Constitutional Rights v. CIA*, 765 F.3d 161, 166 (2d Cir. 2014)). "Summary judgment is warranted on the basis of agency affidavits when the affidavits describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary

---

[10] There is no dispute that the FBI's search for responsive documents was adequate.

evidence in the record nor by evidence of agency bad faith." *Wilner*, 592 F.3d at 73.

## DISCUSSION

In this case, the FBI argues that it has properly withheld some portions of the requested 302s pursuant to Exemptions 1, 3, 6, 7(A), and 7(C). In evaluating this argument, the Court has conducted an *in camera* review of the withheld documents themselves. The Court has also considered the declarations of three FBI officials: David M. Hardy, Carl Ghattas, and Michael F. McPherson. In addition, the Court has held two *ex parte* hearings with the FBI, during which the Court posed specific questions regarding the FBI's basis for withholding responsive material. Finally, the Court has considered the publicly available information cited by the parties, including Abdulmuttalab's sentencing memorandum, Dr. Perry's report, official statements made by former President Obama and former Attorney General Holder, and various newspaper articles cited by the Times.

After considering these materials and the parties' arguments, the Court concludes that the material that remains withheld, with one seemingly inadvertent exception, is indeed exempt from disclosure under Exemptions 7(A), 7(C), and 1.[11]

## A. Exemption 7(A)

Exemption 7(A) allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7). In enacting this exemption, "Congress recognized that law enforcement agencies had legitimate needs to keep certain records confidential, lest the agencies be hindered in their

---

[11] The Court need not address the FBI's argument that this withheld information is also exempt under Exemptions 3 and 6.

14

investigations." *Robbins Tire & Rubber Co.*, 437 U.S. at 232. "Exemption 7(A) explicitly requires a predictive judgment of the harm that will result from disclosure of information, permitting withholding when it 'could reasonably be expected' that the harm will result." *Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d at 926 (quoting 5 U.S.C. § 552(b)(7)(A)). While "Exemption 7(A) 'does not require a presently pending 'enforcement proceeding,'" *id.*, the agency invoking this exemption must nonetheless "show that the material withheld 'relates to a concrete prospective law enforcement proceeding," *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1096 (D.C. Cir. 2014) (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 58 (D.C. Cir. 2008)).

After carefully reviewing the records the Times seeks to obtain, the Court is persuaded that the remaining portions of the 302s were properly withheld under Exemption 7(A). As a threshold matter, there is no dispute that these records were "compiled for law enforcement purposes." *See* Times Mem. at 11. Through sworn declarations of three senior FBI officials, as well as testimony from senior FBI officials at *ex parte* hearings before the Court, the FBI has also carried its burden of demonstrating that the production of these records "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7). The FBI has identified many other "pending and related national security investigations and prosecutions" that are related to its investigation of Abdulmutallab. First Hardy Decl. ¶ 45. Specifically, the FBI has cited its ongoing investigations of Al-Qaeda in the Arabian Peninsula as one investigation with which the production of the requested records would interfere. *See* McPherson Decl. ¶ 13. The FBI has thus carried its burden of demonstrating the existence of a pending investigation to which the withheld records relate.

The FBI has further detailed the ways in which the production of the requested records would interfere with these investigations. In particular, the FBI has explained, and the Court has confirmed through *in camera* review, that the withheld portions of the 302s cross-reference specific national security investigations and prosecutions of other terrorism suspects. *See, e.g.,* First Hardy Decl. ¶ 45. As Carl Ghattas explains, the withheld material thus illuminates links between several specific investigations—thereby allowing the FBI's adversaries to "piece[] together" a "mosaic of information" regarding the agency's investigative strategy. *In Camera, Ex Parte* Decl. of Assistant Director Carl Ghattas ("Ghattas Decl.") ¶ 5 (Dkt. 39). Through the declarations of its officials and in response to the Court's specific questions during *ex parte* hearings, the FBI has shown that it is reasonable to expect that the disclosure of such a "mosaic" would enable suspects to more easily evade investigation. Particularly in light of the deference owed to government officials on matters related to national security, the Court concludes that the FBI has carried its burden of showing that the production of the remaining portions of the 302s could reasonably be expected to interfere in pending and anticipated law enforcement proceedings. *See, e.g., Ctr. for Nat'l Sec. Studies*, 331 F.3d at 928 (holding that the government properly withheld the names of Guantanamo detainees under Exemption 7(A), as the government reasonably expected that disclosure of the detainees' names "would give terrorist organizations a composite picture of the government investigation" and "would enable al Qaeda or other terrorist groups to map the course of the investigation and thus develop the means to impede it"); *cf. CIA v. Sims*, 471 U.S. 159, 179 (1985) (explaining that, in the national security context, "bits and pieces of data 'may aid in piecing together bits of other information even when the individual piece is not of obvious importance in itself'" (quoting *Halperin v. CIA*, 203 629 F.2d 144, 150 (D.C. Cir.

1980))).

## B. Exemption 7(C)

The FBI was also correct in determining that portions of the 302s are exempt from disclosure under Exemption 7(C). This exemption allows agencies to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). This exemption requires courts to "balance the public interest in disclosure against the [privacy] interest Congress intended the Exemption to protect." *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 776 (1989). Under Exemption 7(C), "personal privacy" involves "at least two different kinds of interests." *Id.* at 762. "One is the individual interest in avoiding disclosure of personal matters, and another is the interest in independence in making certain kinds of important decisions." *Id.* "It is well established that identifying information such as names, addresses, and other personal information falls within the ambit of privacy concerns under FOIA." *Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 285 (2d Cir. 2009). "As for the public interest against which the privacy interest is to be weighed, the Supreme Court has made clear that there is only one relevant interest, namely, 'to open agency action to the light of public scrutiny.'" *Id.* (quoting *Reporters Comm.*, 489 U.S. at 772); *accord Bibles v. Or. Natural Desert Ass'n*, 519 U.S. 355, 355–56 (1997) (per curiam). "Whether the public interest in disclosure warrants the invasion of personal privacy is determined by the degree to which disclosure would further the core purpose of FOIA, which focuses on 'the citizens' right to be informed about what their government is up to.'" *Associated Press*, 554 F.3d at 285 (quoting *Ray*, 502 U.S. at 177). "Where the privacy

17

concerns addressed by Exemption 7(C) are present, the exemption requires the person requesting the information to establish a sufficient reason for the disclosure." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004). Specifically, "the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and that "the information is likely to advance that interest." *Id.*

The FBI has demonstrated that the names or identifying information of certain individuals mentioned in the withheld portions of the 302s, to the extent that this information has not already been publicly disclosed, are exempt from disclosure under Exemption 7(C). The FBI has explained, and the Court has confirmed through *in camera* review, that several of the withheld 302s provide the names or other identifying information of subjects of investigative interest, FBI Special Agents and support personnel, non-FBI federal government personnel, and other third parties. *See* First Hardy Decl. ¶¶ 60–68. There can be no dispute that names and identifying personal information present privacy concerns under Exemption 7(C). *See Associated Press*, 554 F.3d at 285. More specifically, with respect to subjects of investigative interest, the Court agrees with other courts that the "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1174 (D.C. Cir. 2011) (quoting *Schrecker v. U.S. Dep't of Justice*, 349 F.3d 657, 666 (D.C. Cir. 2003)). Similarly, disclosure of the names of law enforcement and other government personnel in investigatory files could subject these individuals to "embarrassment and harassment in the conduct of their official duties and personal affairs." *Massey v. FBI*, 3 F.3d 620, 624 (2d Cir. 1993), *abrogated on other grounds by Milner*, 562 U.S. 562. In addition, the disclosure of the names or identifying information of third parties or witnesses could subject them

18

to harassment or suspicion, perhaps suggesting to others that they have themselves been subjects of criminal investigation. *See, e.g.*, *Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1092 n.3 (D.C. Cir. 2014) (explaining that "witnesses, informants, and investigating agents" have "a substantial privacy interest in preventing disclosure of their names in law enforcement files"); *New York Times*, 235 F. Supp. 3d at 539 ("[T]hird parties including witnesses, the targets of the investigations, covert and overt CIA personnel, foreign officials, and human sources, whose personally identifying information is being withheld, have a strong privacy interest in not being identified with the Government's criminal investigation." (internal quotation marks omitted)). Accordingly, the FBI has shown that the disclosure of names and identifying information of third parties mentioned in the withheld 302s risks invading the privacy interests that Exemption 7(C) was designed to protect.

Under the circumstances of this case, the Court concludes that the public's interest in government transparency does not outweigh the privacy interests of the third parties named or identified in the withheld 302s. As the Times notes, the public has a significant interest in understanding governmental activities at issue in this case, including the government's basis for its targeted killings of suspected terrorists, such as Awlaki, and its treatment of individuals detained on terrorism-related charges. Here, however, the disclosure of the specific names or other identifying information of third parties mentioned in the withheld records would do little, if anything, to shed light on these activities. The Times has not presented any argument to the contrary. Thus, the Court finds that the FBI properly withheld names and identifying information of third parties in the 302s pursuant to Exemption 7(C).

## C. Exemption 1

Finally, the Court concludes that some information in the withheld 302s is exempt from disclosure under Exemption 1. Exemption 1 provides that agencies need not disclose information that is: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) [is] in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1). Information that pertains to "intelligence activities (including covert action), intelligence sources or methods, or cryptology" may be properly classified. *See* Exec. Order No. 13,526 § 1.4(c), 75 Fed. Reg. 707, 707 (Dec. 29, 2009). The "determinative consideration under Exemption 1" is whether the information the government seeks to withhold "reasonably could be expected to result in damage to the national security." *Florez*, 829 F.3d at 185 n.6 (quoting Exec. Order No. 13,526 § 1.1). When considering whether Exemption 1 applies to a particular record, courts "must accord *substantial weight* to an agency's affidavit concerning the details of the classified status of the disputed record." *ACLU*, 681 F.3d at 69 (emphasis in original) (quoting *Wolf v. CIA,* 473 F.3d 370, 374 (D.C. Cir. 2007)).

The FBI correctly determined that some information in the withheld 302s is exempt under Exemption 1. In particular, the FBI has explained that the withheld 302s contain classified file numbers, which may together form a mosaic of the FBI's investigative activities and methods. *See* First Hardy Decl. ¶¶ 53–54. Hardy, who acted as "an original classification authority," *id.* ¶ 50, explains that these file numbers "contain a geographical prefix . . . and case number, which includes the numerical characterization of the type of investigation followed by a chronological number assigned to a specific investigation/activity," *id.* ¶ 54. Thus, these file numbers, when pieced together, would provide any hostile party a window into the "probable intelligence that the

FBI has gathered, or can collect, concerning them," which would provide a powerful "means of deflection" to those who wish to harm the national security. *Id.* On the basis of these representations, as well as its own *in camera* review of the 302s and its *ex parte* questioning of senior FBI officials, the Court finds that the FBI was reasonable to expect that the disclosure of these classified file numbers would result in damage to the national security.

In addition, the Court concludes that the names of individuals depicted in photographs shown to Abdulmutallab were properly withheld under Exemption 1. McPherson stated that these individuals are "of investigative interest to the FBI and the Intelligence Community." McPherson Decl. ¶ 9. Disclosure of these names would not only alert those who are named that they are under investigation, but would also inform other hostile parties of the progress of the FBI's terrorism investigations. The FBI reasonably expects that disclosure of this information would harm the national security by prompting these individuals to evade investigation or develop countermeasures. The Court is persuaded that these names, like the FBI's classified file numbers, were properly withheld as classified information under Exemption 1.

**D. Waiver**

The Times argues that the government has waived any valid claims of FOIA exemptions through its official disclosures of information derived from the 302s. *See* Times Mem. at 23–26. After carefully comparing the withheld portions of the 302s to the publicly disclosed information identified by the Times, the Court concludes that the information that remains withheld has not been officially disclosed.

"Voluntary disclosures of all or part of a document may waive an otherwise valid FOIA exemption." *New York Times Co. v. U.S. Dep't of Justice*, 756 F.3d 100, 120 (2d Cir. 2014)

(quoting *Dow Jones & Co. v. U.S. Dep't of Justice*, 880 F. Supp. 145, 150-51 (S.D.N.Y. 1995)). In *Wilson v. CIA*, 586 F.3d 171 (2d Cir. 2009), the Second Circuit held that requested information is deemed to have been officially disclosed only if it (1) "is 'as specific' as the information previously released," (2) "'matches' the information previously disclosed," and (3) was "made public through an official and documented disclosure." *Id.* at 186 (alterations omitted) (quoting *Wolf v. CIA*, 473 F.3d 370, 378 (D.C. Cir. 2007)). *Wilson* adopted this standard from the decisions of the D.C. Circuit and characterized it as a "strict test." *Id.*

Five years later, the Second Circuit revisited the *Wilson* test in *New York Times Co. v. U.S. Department of Justice*, which involved a FOIA request for the Office of Legal Counsel's ("OLC") opinions or memoranda concerning its legal basis for the targeted killings of U.S. citizens through drone strikes. *See* 756 F.3d at 104. In *New York Times*, the Second Circuit concluded that the government waived a claim of exemption for an OLC memorandum by releasing a "white paper" that "virtually parallel[ed]" the legal analysis in the memorandum, even though the memorandum discussed some issues not addressed in the white paper. In reaching this conclusion, the Second Circuit explained that it did not understand "the 'matching' aspect of the *Wilson* test to require absolute identity." *Id.* at 120. Such a requirement "would make little sense," the Circuit noted, as a "FOIA requester would have little need for undisclosed information if it had to match precisely information previously disclosed." *Id.* Rather, the Second Circuit reasoned that, in light of the "substantial overlap" in the legal analyses in the white paper and the OLC memorandum, *id.* at 116, release of the OLC memorandum "adds nothing to the risk," *id.* at 120. While affirming that *Wilson* "remains the law of this Circuit," *New York Times* went on to question its "provenance" and note that "a rigid application of it may not be warranted." *Id.* at 120 n.19.

In light of *Wilson* and *New York Times*, the parties propose different standards for determining whether the government has officially disclosed requested information. The Times argues that "the test for waiver is whether disclosure of the withheld information would enhance any risk above and beyond what has already been disclosed." Times Mem. at 24. The FBI, by contrast, argues the withheld information "must still match, or 'virtually parallel,' the disclosed information in order to trigger the official acknowledgement doctrine." FBI Mem. at 20. As the FBI notes, "a high degree of overlap between the information previously disclosed and the information the agency sought to protect" is sufficient to constitute official disclosure. Def.'s Letter to Ct. at 2 (May 26, 2017).

In this case, the Court need not decide how rigidly to apply the *Wilson* test or further articulate the standard for waiver because, under either standard proposed by the parties, the information that remains withheld from the 302s has not been officially disclosed. The Times is correct that the government has disclosed a substantial amount of information regarding Abdulmutallab's activities, including his association with Awlaki and his training with al-Queda in the Arabian Peninsula. *See* Times Mem. at 25–26. As discussed above, these disclosures have come from a variety of sources, including the government's sentencing submissions in its criminal case against Abdulmutallab, two FBI agents who interviewed Abdulmutallab, and from President Obama and other White House officials.

The Court cannot conclude, however, that the information that remains withheld "matches" or that it "substantially overlaps" with the information that the government has publicly disclosed while "add[ing] nothing to the risk." *New York Times*, 756 F.3d at 120.    In reaching this determination, the Court has carefully considered the factual information the FBI has withheld,

23

alongside the information that has already been disclosed. The Court has also taken care to consider the context of any withheld information, as context itself may convey information that has not been disclosed. *See, e.g., Intellectual Prop. Watch v. United States Trade Representative*, 205 F. Supp. 3d 334, 358 n.25 (S.D.N.Y. 2016) (explaining that, "where disclosure of the context itself would reveal information that is otherwise protected," an applicable FOIA exemption may not have been waived); *see also New York Times Co. v. U.S. Dep't of Justice*, 806 F.3d 682, 686–87 (2d Cir. 2015) (explaining that "differences in context" between previously disclosed records and requested records are relevant in determining whether the government has waived exemption under FOIA). Accordingly, the Court concludes that the FBI has not waived the FOIA exemptions applicable to the requested information that remains withheld.[12]

## CONCLUSION

Throughout this litigation, the Times has demonstrated a tireless commitment to maximizing access to information that is, without doubt, of substantial public interest. In evaluating the Times's claim, the Court has carefully inspected hundreds of documents and conducted two *ex parte* hearings with the FBI regarding its reasons for withholding the requested information. In the end, the FBI has made three productions of responsive material, substantially narrowing the pool of records it had initially withheld.

The Court now concludes that all information responsive to the FOIA requests in this case that remains withheld is properly exempt from disclosure, particularly in light of the deference

---

[12] The Court's conclusion that the withheld information has not been officially disclosed has one narrow, and perhaps inadvertent, exception. In the sentence beginning with "having," in paragraph 7 of its *ex parte* May 26, 2017 letter, the FBI stated that it released certain information that appears to remain redacted. The FBI has one week from the filing date of this opinion to either provide a supplemental disclosure with this information or to submit an *ex parte* letter informing the Court of its reasoning for revising that decision.

rightly due the government's intelligence agencies on matters of national security and terrorism.

Accordingly, the FBI's motion for summary judgment is granted.[13]

Dated:     November 7, 2017
           New York, New York

                                              Ronnie Abrams
                                              United States District Judge

---

[13] Prior to filing, the Court made this opinion available to the government to afford it an opportunity to advise it whether any classified information, not intended to be disclosed by this opinion, has been inadvertently disclosed.